Good morning, Serene Charlotte, Federal Defenders, on behalf of Ms. Espinoza-Pareda. In this case, the District Court erred by ordering Ms. Espinoza-Pareda forcibly medicated because under Cell v. United States, three of the four cell factors were not satisfied in this case. In the first instance, the District Court found that attempted illegal reentry under 8 U.S.C. Section 1326 was a serious crime, as Cell requires. And in this case, that cannot possibly be the case. I'm mainly going to focus on three of the four factors, which are Counsel, do we even need to get to Cell? Couldn't you argue that under Cell, what the District Court should have done is go through the Harper dangerousness analysis, and that was first, and that's where he erred? The District Court did err by not asking the government why they're not proceeding under dangerousness in deciding that the cell factors had been met, and that's clearly inappropriate under Cell. The District Court... Doesn't Cell expressly say that the government needs to ask for forced medication on Harper grounds first, before you go to the second question of the cell factors, and whether or not that she should be forcibly medicated to be competent to stand trial, or does she need to find out whether she's a danger to herself or others? Yes. I'm sorry, I'm a little lost, because the record's quite clear on that. I mean, that she is not as long as she's in prison, but she is if she's released. Yes. I mean, there's no dispute about that. But the District Court didn't make any determination on that. There's no dispute about it, is there? The doctor said when Ms. Espinoza-Preda is at FMC Carswell, she does not pose a danger. But then the District Court went on to consider when she's at the Metropolitan Correctional Center, he thought she did pose a danger. So it's a bit unclear, because if Ms. Espinoza-Preda is forcibly medicated and brought back to San Diego, where she's going to stand trial, she's not going to be in the environment of the FMC Carswell. She's going to be at one of the correctional pretrial detention facilities. And the District Court considered indicators that she was a danger there and considered it completely blending the Harper and the Sell inquiry, which Sell says that its own inquiry exists solely to determine the competency of an individual. And that's at 539 U.S. at 180. You're not supposed to consider the Sell factors in deciding whether or not someone's dangerous. The doctors did also suggest that perhaps she would pose a danger if released. And that's another criteria that the District Court didn't properly consider. The dangerousness certification had been inadvertently not issued in this case. It's not necessarily in my client's interest to have it issued. Well, I know. That's where I don't quite understand what you're arguing. I mean, what do you want? Because we don't want the considerations of dangerousness that the District Court improperly imported into the Sell inquiry to be at all a factor in a decision to medicate her. Because in fact, the government chose not to proceed on grounds of danger. I do have to agree with Judge Wardlaw's reading of the record, but I don't think that in this particular case, I don't believe that my client does pose a danger. Those factors weren't properly fleshed out in front of the District Court because we were under the assumption that dangerousness was not what the ground that the government was proceeding upon. And they've always disavowed it. They disavowed it in their briefs. And thus, they should be bound by that disavowal. But the District Court's consideration of the evidence of dangerousness is improper. Isn't it okay for the District Court to have considered dangerousness to the extent that he says, look, the crime that the government is prosecuting here involves reentry into the country, which in and of itself, I mean, there might be a difference of view about how super serious that is. But here, it came about in the wake of a conviction for a crime of violence. And she still manifests some violent tendencies, including in my courtroom. So, I mean, what's inappropriate about just putting it in that light? He didn't make any specific finding on it, and it wasn't, but it was just sort of part of the consideration of the seriousness of the offense. Well, he did make a specific finding in that he said that considering the attempted reentry by someone with Ms. Espinoza's dangerousness potential is something that made him determine, at least in part, that this was a serious crime. And there are – No, that's just what I said. And what's wrong with that? There are several problems with that. First of all, SELL expressly says that there are different standards and a different test to determine dangerousness. And those are set forth under PARPER. For SELL, the government's – Let me just focus in, because I think this is – if you're saying that that was error in and of itself, my point is this. He didn't make a specific dangerousness finding. What he did was say, look, the crime here was coming back into the country after having been deported, after having committed a violent crime. And moreover, she still has those tendencies because she acted out in my courtroom right in front of me. So it's a consideration in showing the seriousness of the government's interest in separating her – that is, prosecuting her and getting a conviction. SELL says that the government's interest is in prosecuting a serious crime, not a serious criminal. And there is a great difference. Someone's prior record in this particular case under this offense is not an element of the offense. It's a sentencing factor. And this Court's been quite clear in that. If indeed, as the government urges and all the other cases in other circuits have held, the first factor under SELL, whether it's a serious crime, if that's really de novo review, then we're not going to be examining and disputing and contesting whether or not she had an incident in a jail, whether or not her prior offense is really one that indicates dangerousness. If this is truly de novo review, as it should be – it should be a categorical approach based on just the crime itself and what that entails, not sentencing issues – then this shouldn't be – these facts shouldn't be considered. Your contention, counsel, is that only the attempted reentry is within the four walls of SELL. We can't consider, according to your view, what happened at the hearing. We cannot consider her prior crimes. Is that my understanding? Yes. Because both 4246, civil commitment, and Harper provide the framework for those considerations. SELL specifically said, look, we're focusing only on the government's interest in trial competencies. But that's where I don't get. Civil commitment is a special circumstance that informs whether the government's interest is serious. It lessens it. The possibility of civil commitment lessens but doesn't completely undercut, according to – I think those are almost Justice Breyer's express words – doesn't undercut but certainly lessens the government's interest. So I just don't quite understand why – I mean, it may cut in your favor. I mean, it does cut in your client's favor. But the point is, though, that there are three separate inquiries here. And SELL expressly said that the civil commitment was one avenue, Harper's another avenue, the SELL inquiry is a third avenue. Okay. So you're saying civil commitment is not an aspect of SELL's first prong, that is, the seriousness of the government's interest in prosecuting? In terms of its statement, SELL's statement, that it diminishes the government's interest, yes. But how I read that is that the court has to consider, is this a possibility? Is civil commitment or Harper grounds a possibility? Because if it is, we'd rather have the government go there than go the SELL avenue. And that's how I read SELL. Can we chat for a second about civil commitment? Yes. Because it's not really developed. I mean, it really wasn't developed – the district court didn't make any ruling on it, it's not developed in the record, and the argument's kind of just conclusory. How, in your view, would the possibility of civil commitment play out in this case? Well, in the district court, Ms. Espinoza-Pareda was present in San Diego, thus it would have been the defense position – the district court disagreed, but it would have been the defense position that the certificate of dangerousness could not have been issued by the warden because she wasn't physically present. That's how I read section 4246A. She wasn't physically – I'm sorry. The 4246A says in order to initiate the civil commitment, dangerous – you have to have that certificate of dangerousness filed. Right. And it can only be filed by the warden of a facility where the defendant is hospitalized, and she wasn't there. And I think that perhaps that was why it didn't play out. Unfortunately, she's now there. And we've asked that she be brought back, but that – we were not successful, at least at this juncture in this court. But again, how does it play out in your view? I mean, the possibility of civil commitment – I mean, it's just out there in the air to me. So what would actually happen? Would that – should that seriously diminish the government's interest in this case? I think that the reason that it would is because the courts would prefer – civil commitment is based upon an individual's – the danger that they pose if released. And in Sell, they said that inquiry is an easier one to facilitate than whether these medicines are going to have these trial side effects, et cetera. And they – it seemed that the court suggested a preference in Sell for going that route. And you get a hearing. We would have a full hearing. Would that be in federal court or in state court? The hearing would be in federal court, in district court. When the warden issues the certification of dangerousness, the individual is entitled to a hearing where they're represented by counsel, and we can challenge those findings. And instead here, what happened is the district court decided to consider indicators of dangerousness. We had no right of cross-examination, which Harper says – I'm sorry. Gonzales, Evans, and whoever were right there, weren't they? Oh, yes. But this is an incident at the jail I'm talking about, that the district court – Oh, yeah. – where the guards weren't present. The prior record – That was at the MDC. Yes.  At the jail. The GEO, excuse me. We have several facilities, but – Yeah, but the issue – the issue for civil commitment – and the reason I'm focusing on it is because I personally believe that is your strongest argument, that – the possibility of civil commitment. Well, there is – there is a possibility is abstract to me. And I don't understand – I mean, in a couple of other cases that have been influenced by that possibility, it actually explained how it played out. What would happen? And what would happen to her? And is that something that you would even want, or are we just making an argument here  I don't want my client civilly committed, obviously. But I also do not believe that the district court's consideration of these particular facts in this legal inquiry under whether or not this is a serious crime was proper. I think the court should set forth a categorical approach, as we do when we examine other crimes under SEAL. SEL very specifically says you've got to make specific, individualized findings. Only with regard to whether or not – not with regard to whether or not something is a serious crime, but rather whether or not there are special circumstances which lessen the government's interest in prosecuting the serious crime. That's what I'm focusing on right now. Okay, look, bottom line is you can't tell me how the civil proceeding would play out. Is that right? Should we remand to the district court for him – for you to make a showing of how it would play out in this case? Well, it wouldn't be our requirement to make a showing of how it would play out. The district court would have to inquire of the government as to why they had not pursued – Olga, you're trying to diminish the interest. It's my understanding that the government has to demonstrate – That you don't have an – – in overriding justification and an interest. Okay, well, suppose I think that the government's interest is substantial in prosecuting somebody who has been deported after committing a violent crime and comes back into the country based upon a number of things, and that I think there is a possibility of civil commitment here that is – okay, possibility of civil commitment. In your view, is that enough to say that the government's interest is therefore not serious? I think that that is a consideration that still requires to be explored, that wasn't explored here. So are you saying, counsel, that if this court ultimately finds that the possibility of civil commitment and the fact that it was not explored in the record below, is of enough concern to, at least in our minds, diminish the government's interest that we need to remand – to vacate and remand for further proceedings by the district court to flesh this out, or is it your reading of Sell that we can just factor that into our review of all the four factors in Sell and make a determination without remanding it? Sell appears to suggest that the district court has to consider these things. That's how I read Sell, and I – you know, while I don't want these things to happen to my client, I certainly wouldn't want to misquote the Supreme Court's decision to you, so – I'm not quite sure what you do want to happen to your client. I don't want my client to be forcibly medicated. So I would want the court to find that – Well, but that – you know, one way or another, that's going to happen. I mean, so – so it's either going to happen in the context of a – of making her competent for this trial, or it's going to happen in the context of a civil commitment, one way or the other. I mean, I – I'm just having a little trouble understanding in this situation where the unfortunate person does not have any family who cares about her, apparently, in this country, and is – is there – completely unable to process information and make judgments on her own or in her own behalf. And – and it's unclear to me what you, even, want to have happen to her. I mean, do we want her ending up in limbo in some California state mental institution forever? No. Clearly, what – what we would want would be for the government to simply deport my client back to Mexico. She had not – you know, and that is what we would want for her. And the district court judge here suggested that to the government, and the government said no. Yes. And do you – do you think as a matter of public policy, it's – it – I mean, are you comfortable with the notion that the United States of America just dumps people with this level of mental illness on a foreign country? Well, it is not my job to make policy judgments, nor undersell, is it this Court's. It's supposed to be an individual determination applying the four factors, and in this case, they haven't been met. I mean, it's – and – and I do want to save some time for rebuttal, but I think that the serious crime issue is not the only problem. The record wasn't properly informed medically, nor was this – was there a proper determination of whether it was medically appropriate, and I haven't even gotten to those, but I do want to save some time. Go ahead. Go ahead. Take a couple of extra minutes. Do you want me to address those? If you wish to flesh it out, go ahead. I do, because I don't think that the district court's reliance upon one doctor's anecdotal experience – and the doctor says, I'm going purely from memory, and that's at Excerpt of Record, page 79, and at Excerpt of Record, page 80, he basically said, well, two people have been restored to 100 percent competency that he's seen. This is what the district court relied on to find that she would be substantially likely restored to competency based on this medication. He relied on a doctor who didn't bring any statistics or studies, has seen two people, and the district court's own anecdotal experience, and he said himself at Excerpt of Record, page 110, well, this is all trial and error, and if the trial-related side effects occur, we can fix it. That is not what Sell, Rivera-Guerrera, or Williams anticipate. They want a complete and reliable record. If this drug's really been around since 1994, how could there not be studies and statistics and a doctor who was going from more than two people brought into court? I'll save my remaining time. Okay. Thank you, Mr. Ray. Good morning. May it please the Court. Mark Ray for the United States. Your Honor, the first thing I want to make clear from the record is the district court here did consider dangerousness under Harper, and he did make a finding, and it's at Excerpt of Record, page 94. Oh, I think the problem with what the district court did is he made a he said a lot of things, and sometimes he'd talk about at the end he said he didn't he said, I don't see how dangerousness is implicated here. I don't intend to do that. After Ms. Gordon says, you know, should we have a dangerous evaluation, I don't intend to do that, but having said that, I accept the testimony of Dr. Evans. And then he goes on, and when he's discussing the seriousness of the charge, he goes on and not only talks about the fact that she is an alien, a deported alien who was deported after having committed a dangerous felony, but that she poses a future danger. So he's making findings on his own about posing some future unspecified speculative danger and incorporating that into his decision on the seriousness of that. I don't see what the basis is for that. A couple points in response, Your Honor. First of all, that's two different kinds of dangerousness. When we talk about Harper dangerousness inquiry, that's a danger to yourself or other people in the institutional setting where you're being housed. When, on the other hand, we're talking about seriousness under Sell, what the district court took into effect, and I believe Judge Reimer put it well, that the whole nature of this ---- Judge Reimer put it better than the district court did. I have to say that. I won't deny it. I won't deny it. But I'm going to stand up for the district court here. He knew what the controlling law was, Sell. He held a three-hour hearing. He faithfully tried to apply. First of all, he did say Harper purposes are not presented here, are not implicated. So he got rid of Harper. Which is exactly what Sell required. But then he incorporated it to what I happen to think is to a wrong degree by talking about future threats, you know, poses a danger, which is back to the Harper language and to the seriousness of the crime. See, again, I would disagree, Your Honor. And Sell itself, this is a very fundamental point. Defense counsel would have you believe that these dangerousness inquiries under Harper have absolutely no bearing on the Sell inquiry. That could not be more incorrect. 539 United States at page 183. After discussing Harper, the Supreme Court says, and I quote, even if the court decides medication cannot be authorized on the alternative grounds, the findings underlying such a decision will help to inform expert opinion and judicial decision-making in respect to a request to administer drugs for trial competence purposes. Right. Which says, which is part of what the Supreme Court, why the Supreme Court reasons that you must do the Harper analysis first. And so does that Fifth Circuit case, which he didn't. He didn't do a full Harper analysis. But what would be a full? Just a minute ago, Your Honor, he even said, he says right here, if we were proceeding on the question of dangerousness, and that's what the Supreme Court indicates district courts should do. He didn't do a separate Harper. My reading of it is he didn't do a separate Harper. He really didn't want to get into Harper. He said, I'm considering it only for the limited purposes of factor one itself. That's what he said over and over. And then he nevertheless sort of did a half-hearted Harper thing, incorporating it into the seriousness of the offense, which is what I think is wrong. I think there are steps, and I think the Supreme Court clearly lays out the steps that need to be followed. And the government didn't argue it. I mean, they didn't push that. Right. Because we didn't think that was appropriate based on the evidence. Both Dr. Evans and Dr. Gonzalez testified that she wasn't a threat in Carswell. That's the kind of thing that needs to be found for Harper. I mean, I think Your Honor may be holding the district court too high of a standard here. No, I'm not holding the district court too. Maybe I am. Maybe I am. I guess I don't quite understand how Harper would play out in this case. I mean, it's undisputed that she does not pose a danger. I mean, the undisputed expert opinion was that she doesn't pose a danger in a structured institutional environment, but did if she were released into the public. Exactly. Now, what else would come out in a Harper hearing, a true Harper hearing, in Judge Warren Law's phrase?  Your Honor, I read Harper, I read it a few days ago. I mean, it talks about, I think you basically have the same kind of thing. You have a hearing. You're obviously going to have to have testimony from a medical professional who has observed the defendant, who has evaluated the defendant. Dr. Evans and Dr. Gonzalez both fit the bill here. Under oath and under full cross-examination, they testified that they didn't believe that she was a danger to other people in the institution. And that's why, I know, I think at the end of Dr. Evans' report, he specifically says that's why we request the court to look into the Sell forced medication. I mean, I just, Sell says, sorry. Sell says you have to look at these alternative grounds. The district court on the record says I read Sell, and that's what it requires. He took, he had testimony in front of him from the. Take enough time to get some water. Do you need water? I'm sorry, Your Honors. I'm just too into this, I guess. But when you look at Sell, and you look at the case law that's come after it, it says that the district court has to consider this. Here on the record, the district court says I'm aware of my obligation, what the Supreme Court has put on me. The government isn't moving for this. Footnote four of the defendant's reply brief acknowledges as much. The defendant's not even considering that. So therefore, I'm going to proceed to the Sell for factors. I don't know how much more he has to say. And again, he brings it up again, excerpt of record, page 114. He says, I think I'm treated. These delusions are going to progress and make her more volatile and put her in a position where, under Harper, I would order the same result because she's dangerous to people. He considered Harper, and he found that it wasn't applicable. Let me ask you that a different way. Did the government exhaust its administrative remedies here? Did it go through the prison and the state regulations and the prison regulations in terms of forced medication for dangerousness? The government went through the Sell inquiry. I know that argument's been raised in other circuits. That issue was never litigated here. I think the Bureau of Prisons has taken a position that after Harper, those CFR regulations that used to consider their hearing had now been replaced by judicial determination. And I can't remember off the top of my head what case that is. So the government no longer does it administratively within the prison system, makes the determination itself? I don't believe so. Not in Sell grounds. Well, weren't they saying, not Sell, I'm talking Harper. Harper, but even after Harper, I believe, because they felt when the Supreme Court decided Harper that that sort of superseded. And if that's, I'll find that and I'll bring that in a 28-J letter. So in this case, the failure to issue the certification was not inadvertent? Because it seemed like they were proceeding administratively. Well, there was something about that certificate of dangerous. Dr. Evans testified that the warden hadn't issued it while she was at Carswell. But then that was subsequently, I believe, taken care of in that October 18, 2006 report that Dr. Evans did submit. But, again, this was never, you know, this kind of an issue, I know the defense didn't make a big claim about it, and I don't know that it pertains to the Sell. And so I'm just, you know. That's also, I know on de novo on this serious crime issue, the first legal issue. Exactly. But I think it's also important, some of the other points the defense counsel made, when you look at the seriousness of a crime, it's judged by the severity of its penalties. And although this court hasn't written on that slate yet, other circuits have. The Second Circuit in Gomes, the Fourth Circuit in Evans, they specifically say, Evans said, in light of Duncan and its progeny, it's appropriate to focus on the maximum penalty. Here we know. Is it the statutory maximum, or are we talking guidelines range? I think both are factored, but first the statutory maximum. And, in fact, Evans itself said, you've got to look at the maximum first, not so much the guidelines, because in particular after Booker, guidelines aren't necessarily the best indicator of what a defendant's going to get. But they said, when you look at the statutory maximum, I think the words they even used, such an approach respects legislative judgments regarding the severity of the crime, while at the same time giving. But this is a judge, a district court judge, who said on the record that his view was that she should just be deported. So am I to take from that that he would sentence her to 20 years? I'm glad you brought that up, too. That was a point made in reply brief. I disagree with that's the characterization of the district court. What he said in excerpt of record pages 103 to 104, and also this point goes to how faithfully he applied the cell factors, the third factor says you should consider less intrusive alternatives. He says, I suggested to the government that maybe nine months was enough. The government has considered that position, and now I quote, suggestion by the court. It's not really a position, but a suggestion. But a district court judge suggests something. That's indicative of his views. At one point, but then I'd say, look, Your Honor, what did he put in his final order? Regardless of what he said during the argument stage, he said these are five unique facts why this crime is serious. What's the first one? Because she has a prior felony conviction for violence. What's the second one? She has a 20-year statutory maximum. So what he said before, I mean, when you look at this language, and he goes on to say I respect the divisions in the government. The government has the choice of who to prosecute. Cell says I have to consider alternatives. I'm going to try to talk her into this voluntarily. I've exhausted psychotherapy. And you know what? I even asked the government to think about it. But this is also a point I think Judge Reimer touched on it. This is a serious crime. If you look at page two of Dr. Evans' report, this defendant has a prior conviction. It's spousal, felony spousal abuse. The husband has gotten a TRO against her. He says he doesn't want to have anything to do with her. According to his statement, she's tried multiple times to come back. I think the federal government ---- But counsel, I want to follow up on something. Your opposing counsel indicates that we're supposed to focus solely on, in this case, the reentry crime. Nothing prior to that. You're going to the prior instance. Is that your reading of Cell in terms of seriousness? Are we supposed to look at the entire prior criminal record? Absolutely, Your Honor, because even Cell itself, when we talked about civil commitment, how would that counter affect the potential time in confinement? Then you're going to the sentencing issue that was raised by Judge Wardlaw, because that would only come in on the sentencing end of things, would it not? Correct. But even Cell says at this preliminary stage, courts should take a look at that. If you had a crime, let's say it's a six-month maximum, and she's looking at standing two years in a mental hospital waiting to be medicated, they say that's a consideration. That wouldn't be a consideration if you wouldn't, in fact, look at the potential sentence. So that's why I think the potential sentence is still relevant. And another point defense counsel made, I think she wants to freeze the focus on this charge itself, not look to the prior record. Again, there's judicial precedent to the contrary, albeit from other circuits. Again, Gomes, which is a leading case, the Second Circuit, 387F3 at 160, that was a felon in possession crime. Analogous to this crime, because it's also a status offense, they found it to be serious not only because of the maximum, but because under the felon in possession statute, if you have three prior convictions for serious crimes or drug trafficking, I think you get a 15-year mandatory minimum. And then Gomes said all those factors come into play under Cell, because Cell itself, I think the whole reason we have this dilemma, Cell says you have to have a serious crime, but then it doesn't lay out a test. It doesn't have a nice little four-factor test. It says you look to all the facts. And I think that's what the district court did here. He doesn't just look at the stat max. He looks to the nature of the prior conviction. This wasn't just any old aggravated felony. This was a crime of violence. And I know the defense in their papers, they try to say, oh, she only got two years in prison, and that's the low end of the possible prison sentences. This morning I rechecked the library. Cal Penal Code 273.5, that's a wobbler. She could have gotten county time, six months in jail. No, she got two years in prison as a first offense. I think that says that there's something serious about that. If nothing else, the district court could find that. Did the court in the prior conviction take into account her mental status? Do we know anything about that? That I don't know, Your Honor. The record, I know Judge Burns asked about it. I guess that wasn't completely fleshed out. We do know that she had a commitment to Patton State Hospital, I believe in 1999, in connection with that offense. But there you have it, though. But as far as the seriousness, that's the de novo. The rest of the record, one thing I wanted to make clear, too, I think this case, if you get there, I hope you do, it's all about standard of review. The last three cell factors are factual in nature. And again, the Second Circuit in Gilms, the Tenth Circuit in a case called Bradley, we cite them in our papers, says both those cases say the first issue is de novo. The second through fourth, because they're so intensely factual, are subject to clear error. And that's in accord with other issues under constitutional claims. A Fourth Amendment claim, when you look at the facts in motion to suppress, it's for clear error. Here, the district court had a fully fleshed out cell hearing. The defense had every opportunity to bring their evidence, as did we. Both Dr. Evans and Dr. Gonzalez testified that it was substantially likely that treatment with Risperdal would restore this defendant to competency. And so that makes me wonder whether, I mean, some of their evidence seems somewhat unreliable to me. And I'm wondering, isn't there better evidence out there? I mean, wouldn't you be able to get statistics from the FDA and other kinds of more solid data as to whether or not this second factor would be met? I wouldn't doubt it, Your Honor. But again, when you look at clear error, I think what we have here is certainly sufficient. I think in any case you'll always probably be able to find something better. But in this case, and there's one point I want to focus on this statistic, because Dr. Gonzalez testified that he thought there was an 80 percent likelihood of restoration of competency. And I know at the end of her presentation, defense counsel was talking about that. If you look at this testimony, it's excerpt of records, pages 78 to 80. I think it's somewhat a little mischaracterized the way the defense puts it. Dr. Gonzalez was asked in the last 10 years how many people has he evaluated for pretrial competency. He says 100. Of those 100, he said he found 20 to 30 to be incompetent. That's an excerpt of record 79. On the same page, he says of those 20, all were given Risperdal. Maybe five didn't respond. That right there is already 75 percent, in his experience, responding to Risperdal. But the defense wanted to parse that figure even further. So they said of those 20, how many were given it forcibly? He says 10. Of those 10, how many were restored to competency? Eight to nine. And then the very last statement he makes in his cross-examination, I don't even know if it was responsive, he says, as I said, in one case 100 percent competent, actually two. Excerpt of record 80. He never explains what that meant. And I have a feeling what it means is when you find somebody competent, I mean, this is an inexact science to begin with.  But his testimony, unequivocal, was that 15 out of 20 people responded to Risperdal. When you broke it down into those who were forcibly ejected, eight or nine of 10. And it's not just two people, and I think that's sort of the ‑‑ I mean, I know we review for clear error, but the district court has to find the evidence is clear and convincing on that. So we're reviewing whether or not the ‑‑ we have to look at whether we think he erred in finding the evidence was clear and convincing. And if we think the sample is unreliable or the experience is unreliable, then I think we would have to find clear error. But then, and there's a case we saw in our paper, it warns on clear error review, it's not a question of how this ‑‑ if this court would reach a different conclusion if it weighed the evidence. Here, he's testifying from his personal experience. If he testified about something else, he'd probably get attacked that he didn't have direct knowledge of it. He has these statistics based on his experience. The rest of his evaluation, as that of Dr. Evans says, we find it substantially likely that she will be restored to competency. And then what did the defense have in contravention affidavit of Dr. Carroll? And this is interesting, too. At no point in there does he ever specifically opine the contrary of what those two doctors said. And it's interesting. In Cruz‑Martinez, that's a published FSUP 2D case that the defense cites in its papers, Dr. Carroll was also a retained defense expert in that case. In that case, he did opine that he didn't believe there was enough evidence to show that the defendant would respond to the medication. Here, all he says are ‑‑ one of the things he says, there's a chance she won't be restored. Well, we don't doubt that. If the testimony was that it was 100 percent guaranteed, we probably wouldn't even be here. Another one of his statements is that forced medication is not necessarily in a patient's best interest. But I urge you to review that affidavit. At no point does he say, based on his review of the defendant, that it's not in her medical interest. And I also think for your clear error review, keep in mind Dr. Evans testified in the four months she was at Carswell, he met with her and evaluated her four separate times. Dr. Gonzalez testified that he saw her on almost a daily basis. Dr. Carroll, on the other hand, only saw her once, if I'm correct, and that was for the initial competency evaluation. When he filed that affidavit, it was based on the same information that he had had four months prior and no further meetings with the defendant. So under clear error, which is an extremely deferential standard of review, you have two doctors here opining that it's substantially likely. They give statistics, and the defense doesn't give you anything to truly weaken that. How much time has she already served in Carswell? In Carswell, she's been- How much time since the date of her arrest? Yeah, that was in February of 06, so it's just, I think, 13 months. And like I think we point out in the papers, the guideline range is 57 to 70 months. I mean, it's not anywhere close to that because I know that's another factor that courts consider under- Right, so if you were to take her to trial, if you were to force medicate her and take her to trial, well, first you'd have to see if it worked and if there were any side effects, that it actually was successful and brought her to a confident state, which there is some doubt in the record that that would happen. But then you'd set the trial, you'd have the trial. Isn't it just as likely that even if she were convicted, she'd get time served and be gone? Not if those are her guideline calculations. Well, no, I mean, obviously the judge, he's not bound by them. He's already indicated he thinks she should just be deported. I mean, I really think that diminishes your interest somewhat. I mean, she will have served almost two years probably. But again, I think your Honor sees the district court as thinking this case should have just been flushed away. I don't agree with that. I mean, he made his point. He said a lot. I think that's one of the problems. He would say one thing and then undercut it in the next paragraph next. But isn't it better than if they say nothing at all? I mean, the whole point of Rivera-Guerrero, the whole point of this Court's decision in Williams, we want a complete and reliable record. Issues are going to be hashed out. District judges, sometimes when they see the end of the day, the evidence, they don't always go with their initial belief. Here, at the end of the day, when it came time to actually issue an order, the district court found it was serious, not for one reason, not for two, but no less than five. And he spelled all those out. Is exhaustion jurisdictional here? Again, I don't believe so, but I don't know for sure, Your Honor. I mean, if it's jurisdictional, it doesn't matter that nobody raised it. I know this was, I think, there's some Eighth Circuit, there's a case out there where they made that argument, but it was never entered out in this record. I would like to get your view on the civil commitment possibility. That's something I agree. There's not much discussion in there. But what I take from that is that the government that are treating physicians didn't feel that that was appropriate at this time, and that's why they requested it. How do we know? I mean, at this point, if it's a possibility and it is a possibility that informs or can inform the seriousness of the government's interest, then why shouldn't that be fleshed out? Because, well, when they said, Dr. Evans says, I've evaluated her, we're asking the court for sell. I think you can, one, already infer from that that they don't want civil commitment. And I think civil commitment, when you look at the statute, 4241, that's what we're under now. Civil commitment is 4246. 4241 says we go through everything we can before we get to civil commitment. And even the Supreme Court itself said, you know what, we don't mean to suggest that civil commitment is a substitute for trial. And that memories fade. I mean, here we are, you know, we already ---- Because this is pretty much a paper trial. Right. So that wouldn't be much of a factor in your favor. This is a specific intent crime. I bet defense counsel might disagree with that. Ever since they got that decision, the en banc one a few years ago, now it's all about men's rights. I remember it well. Yeah. Cronus Sanchez, maybe, or the one without a name. Residus. Right. Residus Ulibarri. That's right, Your Honor. These specific intent crimes, it's not so simple. Yeah. But it still seems to me, if civil commitment were, in fact, a viable alternative, why shouldn't it be considered and fleshed out? I think, Your Honor, the court thought sell was what was governing the case. But sell does, in fact, mention civil commitment specifically. But, you know, it doesn't ---- I don't ---- I mean, my questioning is quite honest to both of you. I have no idea how it plays out in this case because it really wasn't developed. I don't even know whether anybody wants it, including the defendant. I wouldn't, but that's neither here nor there. But sell seems to say that that is something that would undermine the seriousness, assuming the government's interest is serious, the possibility of civil commitment would undermine it. It's got to be something more than just that it exists because, of course, it exists. It's on the law books. True. But I think here, when you have the opinion of both these doctors who spent so much time with her, they think the right thing now is to proceed under sell with the forced medication if she doesn't want it. Well, but why is a court necessarily bound by what they want? Because, again, this is clear air review. This is a uniquely medical issue. No, but the district court made no rulings on civil commitment of any sort. Well, that's true, on civil commitment. But sell says consider dangerousness under Harper. We proffered our evidence of why we thought this was serious. I don't know also that sell requires us to disprove every possible factor that would counterweight against our interest, especially when the defense is not even arguing it. Okay. Thank you. Let's add a little bit of time to equalize it because we have time. You've got to take a couple of minutes because counsel. Thank you. I think, first of all, the fact that the district court did say a lot of things is problematic because under this court's decision in Williams, his findings have to be explicit. And that would mean they have to be clear. And it doesn't appear that he's clear about anything in terms of importing the dangerousness findings into whether or not this is a serious crime. And I'm not simply talking about the potential penalties, but about considering the incident at the jail facility as well. It's also a problem in terms of his importing his own anecdotal experience into the findings about whether or not there would be a significant likelihood of restoring her to competency. I first do want to mention, with regard to the serious crime aspect, she's facing a two-year statutory maximum. I-28J, the Covey and Sandoval decision, the indictment does not state a date of deportation. Her statutory maximum is two years, as we stand today and on the record in front of the district court. So not that I think that the government's argument is so significant in terms of, well, Duncan versus Louisiana said that any case where there's a right to jury trial thus is a serious crime. I think that's an erroneous argument and not one that should be adopted by this court. If SEL had wanted to import that definition of serious crime, they could have cited Duncan versus Louisiana. It's their own case, and they didn't do so. And I wouldn't urge the court to adopt that standard, and that's what the Gomez and Evans courts have both held. And I think that's just plain wrong. In terms of the legal issue of whether or not something's a serious crime, if we're going to be getting into what Ms. Espinoza's ex-husband told the doctor about what she did to their family or about what happened with some guard at the MCC, there's no possible way it's a legal issue. Then it would be a factual issue in and of itself. And if this court decides that, it's going to be a conflicting decision with what SEL suggests and with the several circuits that have decided that a serious crime is a legal issue, not a factual one or not a mixed question. In terms of the government's position that we didn't come forward with evidence, you know, Dr. Carroll's declaration doesn't specifically say that in this particular case it is or isn't appropriate. His declaration does say, though, that it is very likely that antipsychotic medications will cause blunting of a person's emotional state and that that would affect a person's ability to testify. And he also discussed the paranoia potential attendant with forcible injection in this particular case, and that's at Excerpt of Record, page 141. The doctors in this case and the district court judge focused on the physical side effects and, like, is she going to die? Is she going to have kidney failure? SEL says you have to focus on the trial-related side effects. And that really wasn't even discussed or developed. And so I think that regardless, you know, in terms of the serious crime, the judge, it was an erroneous determination and should be reversed. Thank you. Thank you, counsel, both of you, for your argument in this matter, which shall be submitted. And the court will stand in recess for the day.
judges: Rymer, Wardlaw, Smith